**In re William Flake RATLIFF and Toni Gale Ratliff, Debtors.**

**Bankruptcy No. 87 B 6598 E.**

United States Bankruptcy Court, D. Colorado.

Nov. 18, 1987.

Robert T. Hippler, McKie and Associates, Denver, Colo., for debtors.

Peter Lucas, Denver, Colo., for FDIC.

Dahil Goss, Asst. U.S. Atty., Denver, Colo., for FmHA.

William Bass, Pendleton & Sabian, Denver, Colo., Chapter 12 trustee.

David Lucey, Rider & Woulf, Denver, Colo., for Federal Land Bank of Wichita.

## OPINION AND ORDER ON MOTION TO CONFIRM PLAN

CHARLES E. MATHESON, Chief Judge.

This matter came before the Court on the Debtors' motion to confirm their Chapter 12 Plan. Objections have been filed by, among others, Farmers Home Loan Administration ("FmHA") and the Federal Deposit Insurance Corporation ("FDIC"). Both FmHA and FDIC have claims against the Debtors which are secured by security agreements and financing statements covering the Debtors' crops and the proceeds thereof. FmHA also holds, as security for its loans, a deed of trust on the Debtor's

interest in one parcel of land which is co-owned by Mr. Ratliff and his brother.

The evidence at the confirmation hearing disclosed that the Debtors, prior to filing their Chapter 12, had entered into four contracts with the Commodity Credit Corporation ("CCC") under the United States Conservation Reserve Program ("CRP"). The purposes of that program have been set forth in the Federal Regulations as follows:

(a) ... The Secretary of Agriculture is authorized to enter into contracts and make payments to eligible owners and operators of eligible cropland to assist them in conserving and improving the soil and water resources of their farms and ranches by converting such land to permanent vegetative cover in accordance with an approved conservation plan. A conservation plan for specified highly erodible croplands shall be developed in cooperation with the Conservation District (CD) in which the lands are located.

(b) The objectives of the CRP are to: (1) Reduce water and wind erosion, (2) protect our long-term capability to produce food and fiber, (3) reduce sedimentation, (4) improve water quality, (5) create better habitat for fish and wildlife through improved food and cover, (6) curb production of surplus commodities, and (7) provide needed income support for farmers. 7 C.F.R. § 704.1.

The Debtors' rights and obligations under the CRP are evidenced by written contracts between CCC and the Debtors. With respect to three of the CRP contracts, the land affected thereby is owned by third-party landlords and leased by the Debtors. The land owners have joined in the contracts and, pursuant to agreements between the Debtors and the land owner, the dollars payable by CCC under the terms of the contracts are allocated between the land owner and the Debtors. The fourth contract affects the land which is co-owned by Mr. Ratliff and his brother. As noted, FmHA holds a deed of trust on the Debtors' half-interest in this latter parcel.

Under the terms of the CRP contracts CCC has agreed to pay the Debtors annual rent for the land over a ten-year period. In return, the Debtors have agreed to carry out a conservation program on the land which includes planting grass or other ground cover and the elimination of noxious weeds. The Debtors are barred from harvesting any crops from the land or utilizing the land for grazing purposes. CCC shares the cost of the initial planting, and the Debtors in this case received, post-petition, approximately $7,000.00 from CCC as reimbursement for the cost of the initial planting of the crop cover. All other payments under the contracts are due post-petition and all services to be provided by the Debtors are to be provided post-petition. If the Debtors fail or otherwise default in carrying out their obligations, they are subject to various penalties, including the forfeiture of all payments received.

Both FmHA and FDIC have asserted rights to the CCC payments. They argue that the CCC payments are in lieu of crops similar to payments under the Pay–In–Kind ("PIK") program and must, therefore, be considered to be "proceeds" from crops, relying on *In re Munger*, 495 F.2d 511 (9th Cir.1974); *In re Judkins*, 41 B.R. 369 (Bankr.M.D.Tenn.1984); *In re Lee*, 35 B.R. 663 (Bankr.N.D.Ohio 1983); *In re Kruse*, 35 B.R. 958 (Bankr.D.Kan.1983). In the alternative, FmHA asserts a right to the CRP payments attributable to the co-owned land on the theory that such payments constitute "rents and profits" which are encumbered under the deed of trust held by the FmHA.

The Debtors, on the other hand, dispute the claim of the governmental agencies. The Debtors argue that all rights under the CCC contracts arise post-petition and are dependent on the post-petition efforts by the Debtors. Thus, they assert that the governmental claims are barred by 11 U.S. C. § 552.

The Court rejects the claims advanced by the FmHA and FDIC. The payments to be made by CCC under the CRP contracts are not "proceeds" of crops, as

PIK program payments have been recognized to be, but serve a different purpose.

With respect to the PIK program, the payments under that program have been described as follows:

> The PIK payments are traceable to the crops subject to the defendant's security interests. The PIK entitlement are for specific crops, on specific acreage, and for specific production. Such a nexus between the entitlements and the original collateral indicates that participation in the PIK program was a substitute for the planting of the crop collateral. *In re Judkins, supra,* 41 B.R. at 373.

With respect to the CRP payments, the regulations quoted above provide that the purposes of this program are to preserve and protect the land from erosion. The payments received by the farmer are not for or in lieu of the production of specific crops on specific acreage. Instead, the payments are denominated in the contract as "rent" and are no more "proceeds of crops" than are any other cash rents a farmer might receive for leasing his land on a cash rent basis.

■ Since the CRP payments are in the nature of "rent," the FmHA asserts a right to the payments pertaining to the co-owned ground under the terms of the deed-of-trust held by it. That claim also must fail on grounds which affect both the FmHA claim to "rents" and the claims of both the FmHA and the FDIC to crop "proceeds."

The Court must keep in mind the procedural context of this case. We are not here on applications by the FmHA and the FDIC for relief from stay or for adequate protection pending the administration of this estate. If we were, and assuming that FmHA and/or FDIC had valid claims to the CRP payments to be made for the current crop year as constituting "cash collateral," the issue of adequate protection as to the use of such cash collateral would be ripe for consideration. But that is not our case.

The issue now before the Court concerns the confirmability of the Debtors' Chapter 12 plan under 11 U.S.C. § 1225. FmHA holds, as security, a deed of trust which purports to encumber "rents and profits."

In Colorado, the holder of such an encumbrance can only gain control of such "rents and profits" by commencing foreclosure and having a receiver appointed, or, when bankruptcy has intervened, by filing notice of claim with the Court. *In re Morning Star Ranch Resorts,* 64 B.R. 818 (Bankr.D. Colo.1986). However, that claim is only effective during the case administrative period, and not post-confirmation.

In Chapter 12, the Debtors' plan shall propose and provide the means for the payment of the creditors' claims. The confirmation of that plan vests title to the property in the Debtors subject to the liens provided for in the plan. 11 U.S.C. § 1227. In the present case, the Debtors' plan proposes to keep the deed-of-trust of FmHA in place and to pay the FmHA the amount of its secured claim over a period of years. If the plan is confirmed, the deed-of-trust is reinstated, the right of FmHA to a receiver ends (at least until defaults occur), and the right of FmHA to receive the CRP payments on a current basis as "rents and profits" terminates. Thus the claim of FmHA that it has a right to receive, as a condition to confirmation of the Debtors' plan, all future CRP payments attributable to the co-owned property fails.

The claim of FmHA under its deed-of-trust cannot be wholly ignored, however. The future income stream represented by the Debtors' interests in the CRP payments has value, and that value, on a discounted basis, has a direct relationship to the value of the land and the allowable amount of the secured claim of FmHA. The right to receive the value of that secured claim must be both provided for and protected. 11 U.S.C. § 1225(a)(5)(B). *See, In re Johnson,* 63 B.R. 550 (Bankr.D.Colo.1986). However, in meeting such confirmation requirements, it does not necessarily follow that FmHA has an absolute right to all future CRP payments.

■ As an alternative, FmHA asserts a right to offset future CRP payments against obligations owed FmHA by the Debtors. This right of offset arises pursuant to the provisions of 7 C.F.R., Part 13, which is expressly incorporated into the

contracts between the Debtors and CCC. Those regulations mandate that, in any CCC program, payments due from CCC must be setoff against any other debt owed by the recipient to any agency of the Department of Agriculture. Since the FmHA is such an agency, it seeks the right to setoff against the future payments to be made by CCC under the contracts as against those monies owed by the Debtors to the FmHA.

The right of offset is recognized under Section 553 of the Bankruptcy Code. That section provides, in pertinent part:

(a) Except as otherwise provided in this section and in Sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

The Debtors argue that even though the CCC contracts were entered into before the filing of the Chapter 12 case, all payments arise post-petition. Thus, the Debtors assert that the debt "owed" by CCC under the contracts did not arise "before the commencement of the" Chapter 12 case, and cannot be offset.

The right of the government to setoff in contracts of this type was dealt with by the bankruptcy court in the case of *Matter of Matthieson*, 63 B.R. 56 (D.Minn.1986). The court there examined the terms of the contract between the debtors and the government and concluded that, pursuant to its terms, it created mutual obligations on the parties. In particular, the court concluded that:

... the obligations of ASCS under the deficiency program contracts arose at the time the contract was created and were thus pre-petition obligations subject to offset under 11 U.S.C. § 553. *Ibid.* at 60.

The logic of the *Matthieson* case is applicable and compelling here.

There is a further reason why the right of the FmHA to setoff the CRP payments must be honored. The CCC contract bears all the classic earmarks of an executory contract. Under its terms both parties have ongoing obligations—the government to pay rent and the Debtors to continue to implement the conservation programs. *In re Harms*, 10 B.R. 817 (Bankr.D.Colo. 1981). In order to obtain the benefits promised under the contract, the Debtors must assume the contract. As the 10th Circuit Court of Appeals has observed:

When an executory contract is involved, courts have reasoned that a debtor who assumes the favorable aspects of the contract (post-petition performance) also must take the unfavorable aspects of the same contract (obligation to repay pre-petition overpayments). *In re B & L Oil Co.*, 782 F.2d 155 (10th Cir.1986).

So here, if the CCC contracts are assumed by these Debtors, they must take the benefits thereof together with any burdens imposed by the express terms of the contract, including the right of the FmHA to setoff the future CRP payments to the extent of the debt owed to the FmHA.

It is unfortunate that the result of this legal hyperbole is that no one wins. The Debtors have acknowledged that if the government has the right to setoff CRP payments due in the future, their Chapter 12 plan is not feasible. Thus there is no incentive for the Debtors to go forward with the conservation program under the CCC contracts. That results in the loss of benefits to CCC in that its soil conservation program is impaired. It also means that FmHA will receive nothing because if the Debtors default, there will be no CRP payments against which the right of offset can be asserted. That the results of the Court's opinion may be less than desirable, however, does not change the obligation of this Court to enforce the law as it exists. As a result, the Court must conclude that FmHA has every right to assert its right of setoff which, by the Debtors' admission, therefore, makes their Chapter 12 plan non-confirmable.

All other conflicts concerning these Debtors' Chapter 12 plan have been settled and resolved. Considering the impact of this

Court's decision, the conflict concerning the CRP payments may, in like manner, be resolvable. In any event the parties deserve the opportunity to seek to reach a resolution of the allocation of the CRP payments. Therefore, the Debtors will be granted twenty (20) days from the date of the entry of this opinion within which time to present an amended plan which is acceptable to the creditors, failing which an order will enter herein dismissing this Chapter 12 case.